UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Concrete Design Specialties, Inc.,

Plaintiff,

vs. REPORT AND RECOMMENDATION

Paul C. Nasvik and Milestones, Inc.,

Defendants. Civ. No. 01-1304 (PAM/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 6th day of August, 2003.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Plaintiff's Motion to Reopen the Civil Action, or to Enforce Settlement Terms, and upon the Defendants' informal Cross-Motion to Enforce Settlement Terms. A Hearing on the Motions was conducted on February 5, 2003, at which time, the Plaintiff appeared by David K. Tellekson and William F. McIntyre, Esqs., and the Defendants appeared by David R. Fairbairn and Alana T. Bergman, Esqs. For reasons which follow, we recommend that the Plaintiff's Motion to

AUG 06 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

36

Reopen Civil Action be granted, and that the other pending Motions be denied as moot.

## II. Procedural and Factual Background

On several prior occasions, the parties, or their counsel, had explored a settlement of this action without success. On September 19, 2002, Paul R. Mooty ("Mooty"), on behalf of the Plaintiff, and Paul C. Nasvik ("Nasvik"), on behalf of the Defendants, met and appreciably advanced the prospects of settlement. After that meeting, the parties exchanged e-mails, and the attorneys for the parties attempted to reduce the settlement agreement to writing. Perhaps with an abundance of optimism, the parties advised the District Court, the Honorable Paul A. Magnuson presiding, that the case had been resolved, and that they would need some additional time in order to present the Court with the closing documents. When drafting of the settlement agreement eluded a resolve, the parties requested additional time to complete their settlement documents, a request which the Court granted. Before the expiration of that extension, the Plaintiff filed its Motions to Reopen, or to Enforce, which prompted the Defendants' Motion to Enforce. In due course, the District Court referred the matter to this Court for a Report and Recommendation.[1]

---

[1]Given the fact that, by every appearance, the parties had re-
(continued...)

The patents at issue, and that are claimed to have been infringed by the Defendants, relate to form liners which are placed in concrete forms to give the resultant facade of the concrete wall the appearance of a hand-laid stone wall. In order to prevent a repetition of the stone wall appearance -- where the observer could deduce that the stone wall was fake -- the form liners attach to one another in a variety of ways so as to assure no recurrent patterns, in the placement of the stone design. Through this means, the appearance of the stone wall suggests the randomness which is characteristic of a hand-laid stone wall.

Nasvik, and his brother Peter, were the inventors of the patents in question, but which were owned by the Plaintiff Concrete Design Specialties, Inc. ("Concrete Design").[2] Mooty, and Nasvik, were co-workers at Concrete Design during the period from 1993, until 1997. According to Mooty's testimony, he came to Concrete

[1](...continued) solved many of the issues which had separated them, at the commencement of the Hearing, we requested the parties' advices as to the propriety of deferring the Evidentiary Hearing in preference to resumed settlement negotiations with Court assistance. The parties made plain that their preference was to conduct the Evidentiary Hearing, and we proceeded with that approach.

[2]Although not fully explained, in the Record before us, Mooty testified that he is the President of Custom Rock International ("Custom Rock"). Accordingly, some of the references in the Record are to Custom Rock. For these purposes, we treat Custom Rock and Concrete Design interchangeably.

Design, on a part-time basis, in 1993, went to a full-time position in 1996, and became the President of the corporation in 1997. Nasvik, and his new corporation, Milestones, Inc. ("Milestones"), are now in competition with Concrete Design, and Mooty. Indeed, the genesis of this law suit occurred when Mooty learned that Nasvik was the successful bidder on the "Highway 100" project in Minneapolis. Mooty traveled to that worksite, in order to investigate the concrete forms that Nasvik was employing there, and concluded that Nasvik, and Milestones, were infringing on the patents owned by Concrete Design. This lawsuit followed.

As noted, on September 19, 2002, Mooty and Nasvik met at a restaurant, for a late lunch, in order to discuss the potential for a settlement. Mooty, and Nasvik, have different recollections as to what was discussed, and as to whether agreements were reached, during the course of that meeting. Generally, however, the discussions focused on three elements of any settlement: 1) a monetary payment for past damages; 2) a royalty payment for the future; and 3) the terms of a license, flowing from Concrete Design to Milestone, that would authorize Milestone to continue with its use of concrete liners. To reach a settlement, Mooty and Concrete Design wanted a Consent Judgment from Nasvik and Milestone, which would attest to the Defendants' past infringement of Concrete Design's patents, and would pledge Nasvik's assistance and support in estab-

lishing the validity of the patents he invented, in exchange for a license to allow Nasvik to continue using the designs he was currently employing. Necessarily, the scope of the license -- broad or narrow -- would directly correlate with the size of the monetary package that Nasvik, and Milestones, would pay. The broader the scope of any license, the greater the amount that the Defendants would have to pay in settlement of the case.

Following the meeting on September 19, Nasvik transmitted, by telefacsimile, a letter to Mooty on September 20, 2000. See, Exhibit 19. In that letter, Nasvik expressed the view that he was "actually beginning to believe that it may be possible to resolve this matter in a way that may have some benefits to both of us." Id. In addition, Nasvik suggested the following terms to a settlement proposal:

> Monetary settlement
>
> 1. One time damage payment of $20,000
>
> 2. An ongoing royalty of $10,000 per year
> 10 years for a period of
>
> Infringement
>
> 1. I am willing to admit infringement of all three patents that I have been accused, as long as I am granted some kind of a use license that will allow me to continue using the patterns that I have already developed and continue to develop and use patterns that use the type of symmetry in the design of form liner pat-

> terns that I am currently using. This use license is to be transferable in some form or another to allow Milestones to continue fabricating Milestones form liners if the ownership of the company changes. All of the information that has been sent to the lawyers as attorneys eyes only will be returned to me and will remain confidential information. There will be no review or audit of Milestones to determine gross sales or profits.
>
> 2. I am willing to assist [Concrete Design] in future infringement cases in the form of testimony and technical support.

Id.

In a letter dated September 22, 2002, Mooty provided a summary of the terms he had proposed to Nasvik, at the September 19 meeting, in relevant part, as follows:

> Cash Component
>
> 1. $25,000 at the time of settlement
>
> 2. $20,000 payable in $5,000 quarterly installments commencing January 1, 2003
>
> 3. $15,000 payable in $3,750 quarterly installments commencing January 1, 2004
>
> While not specifically discussed at our meeting, I have assumed that the other terms of the previous proposal would apply. The $35,000 balance would be in the form of a note, without interest. The note would be a corporate note with a personal guarantee from you.
>
> Limited License
>
> We would be willing to grant you a limited license of the patents at issue that would

> allow you to continue to use the patterns that you have already developed and continue to develop using the type of symmetry of your current patterns. I had discussed with you that we were willing to offer a broader license and you suggested that you were not interested in this broader license. If this needs more discussion, let me know.
>
> The license fee I proposed was $15,000 per year for the first two years, commencing January 1, 2003 and $20,000 per year for the remaining eight years commencing January 1, 2005.

Exhibit 18.

In addition, Mooty proposed that the license fees were based on certain sales volume, and would increase, by five per cent, if Milestone's form liner gross sales exceeded $500,000 a year. Id. In addition, Mooty desired to have the license non-transferable. Id. Mooty's proposal continued, with respect to a Consent Judgment, as follows:

> You had previously indicated that you would admit infringement of the single stone patent. You suggested at the meeting and in your letter to me that you would also be willing to admit infringement of the puzzle piece patent, provided a license was granted to you. I had proposed that, in addition to the admission of infringement of the single stone patent, you acknowledge the validity of the patents. You appeared willing to acknowledge validity of these patents. To be fair, I am not sure where you stand on the admission of infringement of the puzzle piece patent under my proposal and would ask that you clarify this. I would, of course, prefer this, but do not want to overstate the proposal I made at our meeting. Many of our thoughts began to "merge"

> during the discussion. In summary on this subject, I would like to see an admission of infringement of the relevant patents and an acknowledgement of validity as well.
>
> Finally, you had offered to assist us in the future infringement cases in the form of testimony and technical support. I had not included this in my proposal to you Thursday, but would certainly appreciate your assistance in future cases.

Id.

Mooty's proposal precipitated the following response, dated September 23, 2003, from Nasvik:

> I have received you E-Mail dated Sept. 22, 2002, but it does not reflect our deal. On Friday morning, you made an offer. The terms of the offer were: a damage settlement of $25,000, a royalty of $20,000 per year for two years payed in $5,000.00 quarterly installments, and $10,000.00 for the remaining eight years. The settlement also included that I would admit infringement of all three patents, and would assist in future infringement cases in the form of testimony and technical support. The license was to be transferable in some form, and would allow me to continue using my patterns, and develop and use patterns having similar symmetry to the form liners I am currently using.
>
> This is the offer I accepted when I called you later on Friday.
>
> As we discussed, my interest in settling this case is based on my expected expenses in proceeding with the litigation. Your E-Mail is not what you offered, and is not what I accepted. The E-Mail offer still puts me well above any anticipated costs and is therefor unacceptable.

> My willingness to give you a consent judgment for the single stone and puzzle piece patterns and assist with any future infringement cases is contingent on low settlement and royalty fees. I believe that willingness to give you a consent judgment should have considerable value and justify my terms. The suggestion to add a 5% royalty above $500,000 in sales, becomes to [sic] burdensome and I conveyed my disapproval at our meeting on Thursday. It is also important that Milestones has a transferable license. I have mentioned your concerns to my attorneys and they believe it is possible to develop language that would meet your concerns.

Exhibit 17.

In an e-mail, which is dated September 24, 2002, Mooty responded, in part, as follows:

> Thank you for the e-mail and the phone message. I clearly did misinterpret your comment to me on Friday. I thought you had asked about the proposal I had outlined at our meeting at Sunsets and that is what I provided to you in my last e-mail. I did say to you on Friday that your offer was too low and that more money would be needed to make it work from our end. You are correct that I suggested more up front money along the lines set forth in your e-mail (although it was my desire that the future royalty would be greater than $10,000 per year and something less than the amounts I previously proposed). While I realize that you objected to the concept of a 5% royalty over $500,000, I have a real concern that the royalty rate is not economically supportable from our view if sales are in excess of $500,000. I do not wish to defend this rate in future disputes with other parties. It becomes even a greater issue if there is an transferability feature to the license. We had offered the "flat" rate as an accommodation to you, but can not

> have this "flat" rate apply regardless of volume. The other option is to increase the annual flat rate over time. I would think you would prefer the 5% royalty over $500,000 rather than a fixed annual fee at a higher rate. I think we are getting close to finding common ground, but we need to deal with this issue.
>
> I do not wish to negotiate against myself. During the phone conversation on Friday afternoon I told you that I did not wish to negotiate against myself but did give you an indication that I could have some latitude. I told you that we needed more money in the equation. I thought that you were interested in the plan outlined on Thursday at our meeting and it is clear now that I was wrong in my reading of the conversation. I know that you feel that my e-mail offer is well above your anticipated litigation costs and therefore unacceptable to you, but it is also well below my expected recovery. We need to move beyond these positions if this is going to settle.
>
> As stated above, I feel we are getting close to finding resolution. I would ask that you consider my issues as stated above and provide me with your final thoughts. I also remain open to mediation with the magistrate as soon as we can schedule such a session. If not, we can agree to disagree and move forward with the litigation process.

Exhibit 16.

Apparently, with two inconsequential exceptions, see Exhibits 24 and 23, the written communications between the principals concluded at this point, although, given the presentations of counsel, the principals must have continued in their oral negotiations well into October of 2002.

In a Declaration filed with the Court, counsel for Mooty has averred as follows:

> 1. Before about October 17, 2002, Mr. Paul C. Nasvik, defendant, and Mr. Paul Mooty, President of Plaintiff, met and reached agreement on the essential terms of a settlement. On or about October 17, 2002, I spoke to David Fairbairn, counsel for the defendants, Nasvik and Milestones, Inc., and we reached agreement on the remaining terms.
>
> 2. The terms of the agreement included a lump-sum payment of $25,000.00 from the defendants to Concrete Design, and a guaranteed yearly-royalty going forward. The license would cover only defendants current products and small, insubstantial variations.

Declaration of David Tellekson, at ¶¶2-3.

Counsel for Nasvik does not controvert those averments and, in facts, adopts them. See, Response to Plaintiff's Motion to Reopen, at pp. 1-2. Thereafter, counsel advised the District Court that they had settled the case, and the Court issued an Order of Dismissal, with prejudice, but reserved jurisdiction for a period of "45 days to permit any party to move to reopen the action, for good cause shown, or to submit and file a stipulated form of final Judgment, or to seek enforcement of the Settlement terms." Id., at Exhibit A. When a final agreement further eluded the parties, an extension of the 45 day period, from December 9, 2002, to December 23, 2003, was granted. Id., at Exhibit B.

As reflected in the Record presented, the "devil in the details," which delayed a final settlement, surrounded the scope of the license to be provided to Nasvik, and Milestone. Mooty testified that he wanted to allow Nasvik to continue what he was doing at the time of their September 19 meeting. He understood that Nasvik was employing concrete form liners which were of the type being used at the Highway 100 project. Specifically, Mooty understood that Nasvik's concrete form liners involved designs that were symmetrical through the vertical axis -- that is to say, if the design were divided from top to bottom, then the two halves would be mirror images. While one might have thought that reducing that concept to writing would not have eluded the parties, the process was complicated by the fact that, for much of the litigation, Nasvik's design were subject to an "Attorneys Eyes Only," protection which insulated the drawings from Mooty's view.

Indeed, even during the final stages of the negotiations, when the attorneys for the parties were volleying language proposals back and forth, Nasvik's attorneys attempted to lend some certainty to the scope of the license, by submitting, for review by Mooty's attorneys, three "Attachments" of Nasvik's designs that would either be categorized as within the scope of the proposed license, or without. Understandably, counsel for Mooty requested an immediate declassification of those Attachments in order to allow Mooty

to appreciate the entirety of the settlement being proposed by Nasvik and Milestone. As the submissions of the parties make indelibly clear, neither accepted the proposed scope of any license agreement proposed by the other.

## III. Discussion

Under Minnesota law,[3] "to constitute a full and enforceable settlement agreement, all the essential terms must be agreed upon." Transclean Corp. v. MotorVac Technologies, Inc., 2002 WL 31185886 at *8, citing Ryan v. Ryan, 292 Minn. 52, 55, 193 N.W.2d 295, 297 (Minn. 1971); Jallen v. Agre, 119 N.W.2d 739, 743 (Minn. 1963). Only those terms, upon which the settlement hinges, are to be considered material terms. See, Sheng v. Starkey Laboratories, Inc., supra at 1083. Accordingly, "[t]he fact that the parties left some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement." Id., citing Worthy v. McKesson Corp., 756 F.2d 1370, 1373 (8th Cir. 1985); see also, Transclean Corp. v. MotorVac Technologies, Inc., supra at *8; Trnka v. Elanco Pros. Co., 709 F.2d 1223, 1226 n. 2 (8th Cir. 1983).

---

[3]To the extent that anyone would argue, and neither party does here, that Federal common law should govern the issue before us, since the underlying suit involves patent law, see Bergstrom v. Sears, Roebuck & Co., 532 F. Supp. 923, 931 (D. Minn. 1982), we find the reasoning in Transclean Corp. v. MotorVac Technologies, Inc., 2002 WL 31185886 at *4 (D. Minn. 2002), persuasive, and therefore, we apply Minnesota contract law.

The question of whether a particular term is material "is a legal determination for the Court." Transclean Corp. v. MotorVac Technologies, Inc., supra at *8. Here, since the parties dispute the existence, and terms, of a settlement agreement, they have been afforded an Evidentiary Hearing. See, Sheng v. Starkey Laboratories, Inc., 53 F.3d 192, 194 (8th Cir. 1995). Given the Record presented, and the governing principles of Minnesota contract law, we find that no accord was reached by the parties and that, as a consequence, no settlement can be enforced. We reach this finding with great reluctance, for we also conclude that, given the uncontested other elements of the settlement, an accord, which is predicated on a sensible scope for the license agreement, would be far preferable to continued, and costly litigation.

While the Defendants would have us infer that the parties had reached an accord on the scope of the license early on, when Mooty conceded that he was amenable to having Nasvik continue with the designs he was then currently using, such an inference is plainly unreasonable. Mooty testified, without contradiction, that he informed Nasvik that counsel would be needed to draft the scope of the license, or the parties would be relitigating the issue. On direct examination, Mooty testified, as follows, concerning the initial meeting on September 19:

Q. Was there any discussion with potential of a broad license, a full scope license?

A. Yes. We discussed the broad scope license, ah, and Paul was not interested in that for the reasons of, it would be a very expensive license. And, ah, didn't feel that he wanted the full, full license. Umm, I discussed further that, umm, that, ah, you know, well, say, I made a, we did discuss both the broad license which he did not, ah, he did not want.

Q. Did Mr. Nasvik express what he did want to continue to do at that meeting?

A. Well, what was, ah, what, ah, we discussed was continue to do what he was doing. And that's what I took from that meeting was to continue to do what he was doing, and, ah, given the nature of the case in my, ah, as everyone is aware, the confidentiality on seeing anything, what I'm aware of at that time was Highway 100. And so to continue to do what he was doing, that's Highway 100, and those liners, and, ah, that was, ah, the frame of mind I had for a limited license.

Q. So was there any other discussion of a, ah, asymmetry or a broad, ah, anything symmetrical scope?

A. Not to my recollection was there a discussion on use of those terms. As I say, my view on it was [sic] is to continue to do what he was doing, and that was, that was it. I, there was the -- when we bring the broad license back into the picture, I said the broad license has some appeal from the standpoint while albeit expensive, there's no policing of that necessary. Ah, because it covers everything. I said a limited license is

> going to have to be very, ah, you know, it's going to have to be drawn so that we don't end up back here together again. None of us want to get back into this situation. So I said, you know, counsel I'm sure will be able to come up with some language that we can work with. But I left there with the notion it's doing what he's doing, ah, and that language would be forthcoming that we were going to have to work through.

[T. 27-29].

During cross-examination, Mooty expressed the same view -- he wanted a narrow license agreement, drafted by the attorneys, in order that he and Nasvik would not end up in further litigation. [T. 42]; [T. 53-57].

Given the Record presented, we find Mooty's explanations plausible. No one would negotiate the financial terms of the settlement proposed here, without an eye turned toward the parties' future relationship. As Mooty explained:

> And one of the things I was concerned about, and I said this, and I apologize for being repetitive, but I said, I looked at this from a policing standpoint, an enforcement standpoint. I've got to be able to know exactly what I'm enforcing, and if it's so vague that I can't enforce it, and allows [sic] more things, we're going to be right back at each other's throat on this, which we don't, neither of us need to do. So we need to be very specific. And I said, you know, I'm sure that our lawyers can work out some language to our satisfaction. And I let the licensing away, and in my mind is doing what he's doing, and that's it. That's why the terms are the way they are. I'm not about to give away that

> broad a license, you know, particularly in our, ah, we compete in the same arena on. We, we do a lot of national work as well. But I mean, why someone right in this territory would agree to economic terms like that for such a broad license.

[T. 54-55].

While Nasvik urges us to adopt the generalized limitation, such that Mooty would be bound by the comment that Nasvik should be allowed to do what he is doing, even Nasvik's attorneys understood that such a non-particularized scope would be unworkable.[4] As a consequence, counsel for the parties, over a period of two months, attempted to provide specificity to the scope of the license so as to stave the likelihood that the parties would be relitigating the dimensions of the license extended. They did so unsuccessfully.[5]

---

[4]As reflected in the Exhibits before us, counsel for each side proposed language which attempted to advance their respective client's interests. The proposals of the Defendants sought expansive dimensions to the license, and those of the Plaintiff sought to delimit the Defendants' opportunity to settle the case with modest financial expenditures, but with a license which would allow the highest degree of competition between the parties. As a consequence, the Defendants urge a scope that would allow apparently unlimited alterations in the size, angles, and even symmetry, of the Defendants' future designs, while the Plaintiff proposed language that would limit the Defendants to "insubstantial changes in dimension and angle" from those designs currently being employed by the Defendants. Frankly, having reviewed the designs proposed by the Defendants, inclusive of some which, concededly, were not symmetrical along the vertical axis, we are unable to say, as the Defendants suggest, that settlement foundered on seller's remorse on the part of the Plaintiff.

[5]The Defendants appear to suggest that, the fact that the (continued...)

In sum, we find that an essential element in the parties' settlement, one which was integral to the other elements, was not agreed upon, and that no accord was reached on the scope of the license which would be available to the Defendants. As such, we have nothing to enforce in the way of a settlement, and we recommend that this action be reopened.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Plaintiff's Motion to Reopen the Civil Action [Docket No. 30] be granted.

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to

---

[5](...continued)
Plaintiff's attorneys had access to "Attorneys Eyes Only" materials, even though Mooty did not, warrants an imputation of the attorneys' knowledge to Mooty. Such an imputation would be particularly unjust, where the Defendants seek to bind Mooty on generalities expressed in negotiations, between he and Nasvik, in the absence of attorneys for either party. Given the limitations in his access to confidential information, Mooty would have been foolhardy -- in the extreme -- not to defer the drafting of appropriate dimensions, in the scope of any license to the Defendants, to his attorneys, who had access to the information that he did not.

this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 22, 2003,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 22, 2003,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.